UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Royce-George & Associates, LLC, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| U.S. BANK, N.A., as Trustee for Morgan | * | Civil Action No. 18-cv-12198-ADB |
| Stanley Bank of America Merrill Lynch Trust | * | |
| 2013-C13 Commercial Pass-Through | * | |
| Certificates, Series 2013-C13, and WELLS | * | |
| FARGO BANK, N.A., | * | |
| | * | |
| Defendants. | * | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

BURROUGHS, D.J.

Plaintiff Royce-George & Associates, LLC ("RGA") brings this action against U.S.

Bank, N.A., as Trustee for Morgan Stanley Bank of America Merrill Lynch Trust 2013-C13

Commercial Pass-Through Certificates Series 2013-C13 ("U.S. Bank") and Wells Fargo Bank,

N.A. ("Wells Fargo" and together with U.S. Bank "Defendants"). RGA claims that Defendants

are improperly withholding monthly lease payments that Walgreens Company ("Walgreens") is

paying for a now vacant drugstore on property owned by RGA. U.S. Bank is the note holder and

mortgagee by assignment of a non-recourse mortgage on RGA's property at 78 Church Street in

Flemington, New Jersey (the "Property"). [ECF No. 13 ("Amended Complaint" or "Am.

Compl.") ¶¶ 8, 12, 14]. Wells Fargo collects the rent for the Property and services the loan for

U.S. Bank. Id. ¶ 10.

Rite Aid leased the Property until February 2018, when its lease (the "Lease") was

assigned to Walgreens in connection with the acquisition of nearly 2,000 Rite Aid stores. Id.

¶¶ 11–12. Rite Aid continued to operate a drugstore at the Property (the "Flemington Rite Aid")

until approximately July 2018, when the store ceased operations because it was among 600 stores that the Federal Trade Commission ("FTC") required the companies to close as a condition for approval of Walgreens' acquisition of the Rite Aid stores. Id. ¶¶ 5, 13, 14. Following the closure, Defendants asserted that because the store was no longer open to the public, they were entitled to withhold Walgreens' rent less debt service payments (referred to as "excess cash flow") that would otherwise have been forwarded to RGA. Id. ¶¶ 10, 14. The excess cash flow is instead being held in escrow.

RGA asserts that, by withholding the excess cash flow, Defendants have breached the parties' contracts and a violated New Jersey law. RGA brings claims for a declaration that Defendants must forward the excess cash flow to RGA ("Count I"), breach of the implied covenant of good faith and fair dealing by U.S. Bank and Wells Fargo ("Count II" and "Count VI," respectively), breach of contract by U.S. Bank and Wells Fargo ("Count III" and "Count V," respectively), and violation of the New Jersey Consumer Fraud Act ("NJCFA") against both Defendants ("Count IV"). Before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons explained herein, the motion to dismiss [ECF No. 16] is **GRANTED IN PART** and **DENIED IN PART**.

I.      BACKGROUND

The following facts are drawn from the Amended Complaint, the well-pleaded allegations of which are taken as true for the purposes of evaluating the motion to dismiss. See Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014). Certain details are also culled from documents referred to in the Amended Complaint and from documents whose authenticity is not disputed by the parties. See Alvarez-Mauras v. Banco Popular of P.R., 919 F.3d 617, 622

(1st Cir. 2019) (holding that courts may consider additional documents the authenticity of which are not disputed by the parties).

RGA is a Massachusetts limited liability company with a principal place of business in the Commonwealth. Am. Compl. ¶ 1. U.S. Bank is a corporation organized under the banking laws of the United States with its principal place of business in Ohio. Id. ¶ 2. Wells Fargo is likewise organized under the banking laws of the United States and has its principal place of business in California. Id. ¶ 3.

On September 3, 2013, RGA obtained a $2.5 million non-recourse mortgage loan from Morgan Stanley Mortgage Capital Holdings, LLC ("Morgan Stanley"), which was later assigned to U.S. Bank. Id. ¶ 8. To secure the loan, RGA granted a mortgage on the Property to Morgan Stanley and also granted it the right to income from the Lease. Id. Wells Fargo services the loan for U.S. Bank, meaning that it collects the rent from Rite Aid, pays the debt service to U.S. Bank, and then ordinarily forwards the balance or "excess cash flow" to RGA. Id. ¶ 10.

The Lease gave Rite Aid an unfettered right of assignment. Id. ¶ 20. On February 8, 2018, Walgreens bought 1,932 Rite Aid stores, and as part of that transaction, Rite Aid assigned the Lease to Walgreens. Id. ¶¶ 11–12. As a condition for approving Walgreens' purchase of the stores, the FTC required the companies to close 600 stores, including the Flemington Rite Aid. Id. ¶ 13. On July 6, 2018, Wells Fargo notified RGA that it believed the Flemington Rite Aid would be closing and that Wells Fargo would consider the closure a "Trigger Event" under the terms of the reserve and security agreement ("Reserve Agreement") between U.S. Bank, as assignee, and RGA. Id. ¶ 14. Wells Fargo informed RGA that it would therefore invoke its right to withhold excess cash flow until the Flemington Rite Aid reopened or a new tenant leased the Property. Id. ¶¶ 14, 16. Although the Flemington Rite Aid ceased operations on or shortly after

July 6, 2018, Walgreens has continued to make rent payments under the Lease, and Defendants

have not been financially damaged by the closure of the store. See id. ¶ 12.

Section 2.4 of the Reserve Agreement ("Section 2.4") between RGA and Morgan Stanley

provides that the lender may deposit excess cash flow in escrow following a "Trigger Event,"

including a "Tenant Event" as Defendants claim occurred, and until a "Cash Sweep

Transaction." It states:

> EXCESS CASH RESERVE. Commencing upon a Trigger Event (herein defined) and until a Cash Sweep Termination (herein defined) (the period from a **Trigger Event to a Cash Sweep Termination** shall be referred to herein as a "Cash Sweep Period"), Borrower shall, after written notice from Lender, on each Payment Date, deposit with Lender all excess cash flow ("Cash Flow") from the Property (after deduction of Operating Expenses and Debt Service but prior to any distribution to any constituents of Borrower). For purposes hereof, the term **"Trigger Event"** shall mean any of the following: (i) an Event of Default (as defined in the Security Instrument); (ii) the tenant under the Rite Aid Lease (as defined in the Security Instrument) enters into bankruptcy (a "Credit Event") and/or (iii) **Rite Aid gives notice of its intention to terminate its lease early or ceases to do business open to the public at the Property** (each, a **"Tenant Event"**). Such Cash Flow shall be deposited by Lender in an interest-bearing escrow account (the "Excess Cash Reserve Account") to be held by Lender pursuant to the terms of this Agreement and the other Loan Documents.
>
> Each of the following shall constitute a "Cash Sweep Termination":
>
> > (A) In the case of Trigger Event as described in the foregoing subsection (i), such Event of Default has been cured to the satisfaction of Lender;
> >
> > (B) In the case of a Credit Event, such time as Rite Aid either affirms its lease in bankruptcy or a replacement tenant has entered into a new lease acceptable to Lender and is paying full rent;
> >
> > (C) **In the case of a Tenant Event, either a replacement tenant has entered into a new lease acceptable to Lender and is paying full rent or Rite Aid has reopened for business at the Property.**
>
> Upon a Cash Sweep Termination, Borrower shall no longer be required to deposit the Excess Cash in the Excess Cash Reserve Account, and any balance in such Excess Cash Reserve Account shall be disbursed by Lender to Borrower pursuant to the Cash Management Agreement of even date herewith.

[ECF No. 17-1 § 2.4 (emphasis revised)]. Defendants maintain that a Trigger Event, or more specifically a Tenant Event, occurred when Rite Aid ceased operations at the property and that no Cash Sweep Termination subsequently occurred. [ECF No. 17 at 7]. The Reserve Agreement was drafted by Morgan Stanley in 2013. [ECF No. 17-1]. At the time, the parties to the agreement did contemplate the possibility that a financially capable tenant would assume the lease and then permanently cease operations at the Property due to a regulatory requirement while continuing to pay rent. See Am. Compl. ¶¶ 20–25.

Walgreens is a financially stronger tenant than Rite Aid. Id. ¶ 26. It operates from more than 9,800 locations, has annual sales in excess of $100 billion, and is a publicly traded company with market capitalization of approximately $50 billion. Id. Those figures are significantly higher than the corresponding figures for Rite Aid at the time of the assignment. Id. As such, Defendants are not operating at an increased risk of non-payment of the principal and interest on the mortgage loan to RGA, but they have nevertheless invoked Section 2.4 to subject RGA to a "cash trap" by cutting off its income from the Lease. See [ECF No. 18 at 6]. Although the parties did not envision a scenario where a financially able tenant was leasing but not operating from the Property, Defendants nonetheless are refusing to forward the excess cash flow to RGA until Rite Aid reopens for business or a replacement tenant who pays full rent enters into a new lease of the Property that is acceptable to U.S. Bank. Am. Compl. ¶ 37. Rite Aid cannot reopen for business because of the FTC requirement, and a truly "new lease" is unlikely to be entered because the Lease is fully assignable.

In addition to alleging that Defendants are impermissibly withholding excess cash flow, RGA asserts that, in November 2018, Wells Fargo failed to pay the debt service owed to U.S. Bank despite receiving rent from Walgreens and then assessed a late charge and demanded that

RGA pay principal and interest.  Id. ¶ 55.  Specifically, on October 30, 2018, Walgreens paid the

rent due on the Lease for November in the amount of $29,159.33, but Wells Fargo failed to use

those funds to make the appropriate payment to U.S. Bank and instead assessed a late charge of

$1,010.77 against RGA.  Id. ¶¶ 54–55.  Defendants have acknowledged that RGA should not

have incurred any late charges, but they assert that the apparent charge resulted from an error

that affected one billing statement and that the charge has been reversed.  See [ECF No. 17-2 at

2].

## II.     STANDARD OF REVIEW

To evaluate a motion to dismiss for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6), the Court must "accept as true all well-pleaded facts alleged in the complaint

and draw all reasonable inferences therefrom in the pleader's favor."  A.G. ex rel. Maddox v.

Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Santiago v. P.R., 655 F.3d 61, 72 (1st Cir.

2011)).  The complaint must set forth "a short and plain statement of the claim showing that the

pleader is entitled to relief," and should "contain 'enough facts to state a claim to relief that is

plausible on its face.'"  Id. (first quoting Fed. R. Civ. P. 8(a)(2), then quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007)).  "To cross the plausibility threshold a claim does not need

to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R.

Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S.

at 679).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine

whether each allegation, in isolation, is plausible."  Hernandez-Cuevas v. Taylor, 723 F.3d 91,

103 (1st Cir. 2013) (quoting Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 14 (1st Cir.

2011)).  "The plausibility standard invites a two-step pavane."  Maddox, 732 F.3d at 80 (citing

Grajales, 682 F.3d at 45).  First, the Court "must separate the complaint's factual allegations

(which must be accepted as true) from its conclusory legal allegations (which need not be

credited)."  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).

Secondly, the Court "must determine whether the remaining factual content allows a 'reasonable

inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Morales-Cruz,

676 F.3d at 224).

## III.    DISCUSSION

Defendants argue that RGA's claims should be dismissed because the clear and express

terms of the Reserve Agreement allow them to withhold excess cash flow in a reserve account.

[ECF No. 17 at 6–8].  Defendants also assert that, because they acted pursuant to their express

rights, RGA's breach of contract and implied covenant of good faith and fair dealing claims are

untenable, regardless of whether it was possible for RGA to remedy the store closure.  Id. at 12–

14.  Further, they claim that there is no actual case or controversy concerning the late charge

assessed by Wells Fargo, that RGA is not entitled to declaratory relief, and that the parties'

transaction does not fall within the scope of the NJCFA.  Id. at 15–18.

### A.    Counts II and III: Breach of the Implied Covenant of Good Faith and Breach of Contract Against U.S. Bank

The Reserve Agreement provides that it "shall be governed, construed, applied and

enforced in accordance with the laws of the state in which the Property is located," and the

parties seemingly agree that New Jersey law applies.  See [ECF No. 17-1 § 8.1; ECF No. 17 at 7

n.3; ECF No. 18 at 5].[1]  To state a breach of contract claim under New Jersey law, the Plaintiff

---

[1] "It is, of course, a black-letter rule that state substantive law must be applied by a federal court
sitting in diversity jurisdiction."  Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1, 4 (1st
Cir. 1994) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).  "Massachusetts courts

must allege: "(1) a contract between the parties; (2) a breach of that contract; (3) damages

flowing therefrom; and (4) that the party stating the claim performed its own contractual

obligations." Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007) (citing Video Pipeline,

Inc. v. Buena Vista Home Entm't, Inc., 210 F. Supp. 2d 552, 561 (D.N.J. 2002)).

In interpreting a contract under New Jersey law, the polestar "is the intention of the

parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for

intention, the situation of the parties, the attendant circumstances, and the objects they were

thereby striving to attain are necessarily to be regarded." Biovail Corp. Int'l v. Hoechst

Aktiengesellschaft, 49 F. Supp. 2d 750, 774 (D.N.J. 1999) (quoting Halper v. Halper, 164 F.3d

830, 840 (3d Cir. 1999)). "The search for the intent of the parties does not require an inquiry

into the subjective intent of the parties, 'but rather centers on the intent embodied by the

language that the parties chose to memorialize their agreement.'" Id. (quoting Williams v.

Metzler, 132 F.3d 937, 947 (3d Cir. 1997)). "The first step in ascertaining the objective intent of

the parties is to determine whether a contract term or provision is clear or ambiguous." Id.

"When determining whether an ambiguity exists in a contract, the contract documents 'must be

read as a whole, without artificial emphasis on one section, with a consequent disregard for

others.'" RNC Sys., Inc. v. Modern Tech. Grp., 861 F. Supp. 2d 436, 445 (D.N.J. 2012) (quoting

Borough of Princeton v. Bd. of Chosen Freeholders of Mercer, 755 A.2d 637, 645 (N.J. Super.

App. Div. 2000)).

---

'routinely enforce choice-of-law provisions unless the law chosen violates established public
policy or bears no reasonable relationship to the contractual transaction between the parties.'"
Shri Gayatri, LLC v. Days Inns Worldwide, Inc., No. 15-CV-40104-TSH, 2018 WL 1542376, at
*3 (D. Mass. Mar. 28, 2018) (quoting Lambert v. Kysar, 983 F.2d 110, 118 (1st Cir. 1993)).

"[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing. Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997). "This obligation to perform contracts in good faith has been interpreted in New Jersey to mean that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 170 (3d Cir. 2001) (quoting Sons of Thunder, 690 A.2d at 587). The implied covenant of good faith and fair dealing requires parties to exercise discretion with "proper motive and in a manner consistent with the reasonable expectation of the parties." Id. (quoting Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1444 (7th Cir. 1992)). "New Jersey law also holds that a party to a contract can breach the implied duty of good faith even if that party abides by the express and unambiguous terms of that contract if that party 'acts in bad faith or engages in some other form of inequitable conduct.'" Id. (quoting Black Horse Lane Assoc. v. Dow Chem. Corp., 228 F.3d 275, 288 (3d Cir. 2000)).

Defendants argue that the Section 2.4 of the Reserve Agreement allows them to deposit excess cash flow in a reserve account because a Trigger Event occurred when the Flemington Rite Aid ceased operations and no Cash Sweep Termination has subsequently occurred. [ECF No. 17 at 7–8]. There is no dispute that the Flemington Rite Aid ceased operations at the Property on or after July 6, 2018, and accordingly, there can be no reasonable dispute that a Trigger Event, or more specifically a Tenant Event, occurred. Am. Compl. ¶¶ 11, 14; see also [ECF No. 17-1 § 2.4]. Upon the occurrence of a Tenant Event, excess cash flow "shall be deposited by Lender in an interest-bearing escrow account . . . to be held by Lender pursuant to the terms" of the Reserve Agreement and other loan documents "until a Cash Sweep Termination." [ECF No. 17-1 § 2.4]. For purposes of a Tenant Event, a Cash Sweep

Termination occurs once "a replacement tenant has entered into a new lease acceptable to Lender and is paying full rent or Rite Aid has reopened for business at the Property." Id.

The parties' dispute over the proper reading of Section 2.4 of the Reserve Agreement turns on two questions of construction. First, the parties disagree as to whether a replacement tenant who was assigned the Lease prior to the closure of the Flemington Rite Aid, as Walgreens was, can be "a replacement tenant" for the purposes of a Cash Sweep Termination. See [ECF No. 17 at 12–14, ECF No. 18 at 6–7]. The Court cannot definitively answer this question at this stage of the litigation because the Lease and the other potentially relevant loan documents, which are repeatedly referenced by the Reserve Agreement and could inform the interpretation, are not part of the record before the Court. See generally [ECF No. 17-1].[2]

The second question is whether an assignment of the Lease can constitute a replacement tenant entering into a "new lease" given that the Lease existed before the assignment. [ECF No. 17 at 4, 14; ECF No. 18 at 7–8]. The Court is also unable to resolve this dispute at this stage of the litigation because the meaning of "new lease" may also be informed by the terms of the operative Lease. It may be that the assignment of the Lease to a new tenant would be the functional equivalent of a truly "new lease" for the purposes of the Reserve Agreement. New Jersey law seeks to interpret contracts "in accord with justice and common sense and the probable intention of the parties," Krosnowski v. Krosnowski, 126 A.2d 182, 188 (N.J. 1956),

---

[2] Defendants argue that the Lease is immaterial to the meaning of the Reserve Agreement because it is not an agreement between the parties to this lawsuit. [ECF No. 17 at 11–12]. The Court disagrees given that the Lease is referenced in the loan documents and acted as security for the loan and because it appears likely that Morgan Stanley was aware of the Lease's terms at the time the Reserve Agreement was entered with RGA. See Rodgers v. Farer Fersko, PA, No. A-1161-15T2, 2018 WL 1902081, at *3 (N.J. Super. Ct. App. Div. Apr. 23, 2018) (where contracts cross referenced each other and referenced and incorporated regulatory provisions, the court evaluated "the agreements together, and construe[d] them in light of the referenced statutory and regulatory provisions as they existed at the time of the agreements").

and Section 2.4 appears intended to protect the Lender, now U.S. Bank, against the risk of non-payment.[3]  RGA's assertion that once the Court considers the terms of the Lease, which include the lessee's full right of assignment, it will conclude that an assignment of that lease should be interpreted to constitute a "new lease" is sufficient to allow this litigation to proceed.  See Am. Compl. ¶ 17.

Where the Lease is not available to the Court at this stage of the proceedings and Section 2.4 of the Reserve Agreement could arguably be read to allow the assignment of the Lease to Walgreens to qualify as a Cash Sweep Termination, RGA has sufficiently pled its breach of contract claim against U.S. Bank.  RGA may be able to show, with the benefit of a more complete record, that the assignment of the Lease to Walgreens constituted a Cash Sweep Termination and that Defendants therefore breached the Reserve Agreement.  Alternatively, RGA may show that in determining that Rite Aid's assignment of the Lease to Walgreens was not an acceptable "new lease," U.S. Bank breached the covenant of good faith and fair dealing.  See Emerson Radio Corp., 253 F.3d at 170.  Therefore, the motion to dismiss will be denied as to Counts II and III, breach of the implied covenant of good faith and fair dealing and breach of contract against U.S. Bank.[4]

---

[3] U.S. Bank may well also have an interest in protecting against depreciation that might result from the Property being vacant for an extended period.  RGA contends, however, that the Property's value vastly exceeds the principal of the loan.  [ECF No. 18 at 13].  If it does, it is difficult to see how a vacancy during which the Lease is being paid would result in a meaningful increase in U.S. Bank's risk exposure.  Nevertheless, the Court is not now resolving the question of whether an assignment can constitute a new lease.

[4] Because the Court denies the motion to dismiss RGA's breach of contract and implied covenant of good faith and fair dealing claims based on its inability to fully analyze the meaning of the contract language at this stage of the litigation, it will not address RGA's argument that impossibility of performance relieved, or somehow altered, its rights and responsibilities under the Reserve Agreement.

**B.     Counts V and VI:  Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Against Wells Fargo**

Wells Fargo argues that the breach of contract and implied covenant of good faith and fair dealing claims against it are founded on a late charge that was not actually incurred and a supposedly missed debt service payment to U.S. Bank that was actually made.  [ECF No. 17 at 18].  In contrast, the Amended Complaint asserts that "Wells Fargo breached its contract with [RGA] by failing to pay the debt service for November [2018], by misapplying the monies received as rent to another account and by assessing a late charge against plaintiff notwithstanding the fact the funds to pay the debt service were received by Wells Fargo in a timely fashion."  Am. Compl. ¶ 56.[5]  Taking the well-pleaded allegations in the Amended Complaint as fact, however, RGA has adequately pled Counts V and VI, breach of contract and breach of the implied covenant of good faith and fair dealing against Wells Fargo.

**C.     Count I:  Declaration of Rights**

Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, the Court has "substantial discretion in deciding whether to declare the rights of litigants."  MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 136 (2007) (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995)); see also El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 493 (1st Cir. 1992).  Because the Court denies the motion to dismiss the contract claims and the parties remain in an ongoing business relationship, the Court cannot rule out the possibility that declaratory judgment

---

[5] If Wells Fargo is correct that there was a minor administrative error on a single statement that was corrected before RGA brought its claims against Wells Fargo, RGA would be well advised to consider dismissing those claims.  See Cruz v. Farquharson, 252 F.3d 530, 533 (1st Cir. 2001) ("When a case is moot—that is, when the issues presented are no longer live or when the parties lack a legally cognizable interest in the outcome—a case or controversy ceases to exist, and dismissal of the action is compulsory.").

will be appropriate.  The motion to dismiss Count I, request for a declaration of rights, will therefore be denied.

**D.      Count IV:  New Jersey Consumer Fraud Act Claim Against Both Defendants**

The NJCFA provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under [the NJCFA]" may bring a private cause of action for that alleged violation, and a party who prevails in such an action is entitled to treble damages and reasonable attorneys' fees. N.J. Stat. § 56:8–19.  "To state a cause of action under the [NJCFA], a plaintiff must allege: (1) an unlawful practice by the defendants; (2) an ascertainable loss by plaintiff; and (3) a causal nexus between the first two elements – defendants' allegedly unlawful behavior and the plaintiff's ascertainable loss." CIBC Inc. v. Grande Vill. LLC, No. CV 14-5047 (NLH/JS), 2015 WL 5723135, at *3 (D.N.J. Sept. 29, 2015).  "The Act largely permits the meaning of 'unlawful practice' to be determined on a case-by-case basis," Hundred E. Credit Corp. v. Eric Shuster Corp., 515 A.2d 246, 249 (N.J. Super. App. Div. 1986) (citing Kugler v. Romain, 279 A.2d 640 (N.J. 1971)), and the statute reaches conduct that is connected "with the sale or advertisement of any merchandise or real estate" or with the subsequent performance of a person involved in such a transaction, N.J. Stat. § 56:8-2.  "[U]nlawful conduct falls into three general categories: affirmative acts, knowing omissions, and violations of regulations." Slebodnik v. Reynolds & Reynolds Co., No. 3:14-CV-03772 FLW, 2014 WL 6609132, at *4 (D.N.J. Nov. 20, 2014).

Even the most sophisticated businesses may bring claims under the NJCFA where they are subject to an unreasonable, deceptive, or fraudulent act or practice, see id. at *3, but "this does not mean that every contract entered into by a corporation may be the subject of [an

NJCFA] claim." Princeton Healthcare Sys. v. Netsmart N.Y., Inc., 29 A.3d 361, 365 (N.J. Super. App. Div. 2011). "The entire thrust of the NJCFA is 'pointed to products and services sold to consumers in the popular sense.'" Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co., 226 F. Supp. 2d 557, 561 (D.N.J. 2002) (quoting Neveroski v. Blair, 358 A.2d 473, 480 (N.J. Super. Ct. App. Div. 1976)). Transactions that occur pursuant to heavily negotiated contracts "between two sophisticated corporate entities [do] not constitute a 'sale of merchandise' within the intent of the [NJCFA]." CIBC Inc., 2015 WL 5723135, at *4 (citing Princeton Healthcare Sys., 29 A.3d at 365). Additionally, the NJCFA does not reach real estate financing transactions between "experienced commercial entities with relatively equal bargaining power." Id. (quoting Prof'l Cleaning & Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc., No. 2:05-CV-2384 (WJM), 2009 WL 1651131, at *4 (D.N.J. June 12, 2009)). An allegedly "unconscionable commercial practice 'must be misleading and stand outside the norm of reasonable business practice in that it will victimize the average customer.'" Slebodnik, 2014 WL 6609132, at *5 (quoting Smajlaj v. Campbell Soup Co., 782 F. Supp. 2d. 84, 98 (D.N.J. 2011)).

Even accepting that Defendants violated the implied covenant of good faith and fair dealing when they refused to forward the excess cash flow to RGA, a violation of the Reserve Agreement of the sort alleged here does not plausibly fall within the scope of the NJCFA considering the nature of the parties relationship. The Reserve Agreement was a commercial mortgage instrument that was customized to the needs of RGA, a sophisticated entity that secured a multi-million-dollar refinancing of its primary asset. The circumstances here are specific to a peculiar circumstance involving Defendants' contractual obligations based on the Reserve Agreement and the terms of RGA's Lease to a third party, while also implicating the

reasonableness of Defendants' actions given the valuation of the Property and the financial ability of the present tenant. See [ECF No. 18 at 13]. In short, even if Defendants are violating RGA's contractual rights, they are occurring in the context of an unusual, highly fact-specific dispute between sophisticated entities and would not "victimize the average customer." Slebodnik, 2014 WL 6609132, at *5.

Additionally, RGA claims that Defendants violated the NJCFA by "demanding that plaintiff cause one or more actions to occur that defendants knew were impossible for plaintiff to perform as a condition of receiving the fruits of its contract," but that amounts only to asserting a breach of the Reserve Agreement. Am. Compl. ¶ 52. It does not amount to an "unconscionable commercial practice" or an act of "deception, fraud, false pretense, . . . misrepresentation, or the knowing, concealment, suppression, or omission of any material fact" related to the transaction within the meaning of the NJCFA. N.J. Stat. § 56:8-2. Further, where RGA asserts that the parties to the Reserve Agreement did not contemplate a closure of the Flemington Rite Aid occurring in the circumstances now at issue and has acknowledged that the terms of the Reserve Agreement have resulted in a "quagmire," [ECF No. 18 at 6], RGA has not shown that Defendants' refusal to forward the excess cash flow absent a new tenant or an operating business at the Property reflects a "false promise" within the meaning of the NJCFA. N.J. Stat. § 56:8-2. Defendants have not been deceptive or misleading about their interpretation of the Reserve Agreement, and RGA's attempt to transform the parties' business dispute into a NJCFA violation therefore fails. Cf. CIBC Inc., 2015 WL 5723135, at *4–7 (dismissing NJCFA claim concerning custom real estate financing transaction but denying motion to dismiss good faith and fair dealing claims); JPMorgan Chase Bank, N.A. v. Gaspar, No. A-4652-12T4, 2014 WL 6991728, at *6 (N.J. Super. Ct. App. Div. Dec. 12, 2014) (affirming judgment for defendant under NJCFA

where court found defendant was a sophisticated property owner with numerous investment properties who did not fall within the "class of consumers" the CFA was intended to protect). Count IV, violation of the NJCFA, will therefore be dismissed.

## IV.     CONCLUSION

Accordingly, Defendants' motion to dismiss [ECF No. 16] is **DENIED** with respect to Counts I, II, III, V, and VI for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing against U.S. Bank and Wells Fargo.  The motion to dismiss is **GRANTED** with respect to RGA's claims for violations of the New Jersey Consumer Fraud Act.

**SO ORDERED.**

July 16, 2019                                                     /s/ Allison D. Burroughs
                                                                 ALLISON D. BURROUGHS
                                                                 U.S. DISTRICT JUDGE